IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ] | |
| ] | |
| V. ] | Case No. 3:15-cr-191-03 |
| ] | |
| CHARLES D. HALDERMAN ] | |

**DEFENDANT'S POSITION WITH RESPECT TO
SENTENCING FACTORS**

COMES NOW, the defendant, CHARLED D. HALDERMAN, by counsel, George A. Townsend, IV, pursuant to Rule 32 of the *Federal Rules of Criminal Procedure,* § 6A1.3 of the *United States Sentencing Guidelines* (hereinafter U.S.S.G.) and § 18 U.S.C. 3553(a) and hereby represents that he has received and reviewed the Presentence Report (hereinafter PSR) in the above case and has **no objection** to the PSR resulting in a Offense Level Total of 21 and Criminal History Category VI. (PSR, pages 8 and 18).

For the following reasons, the defendant should be sentenced to the low-end of the guideline range: 77 months of incarceration.

I. Relevant Sentencing Law

In United *States v. Abu Ali*, 528 F.3d 210, 259, 260 (4th Cir. 2008) the Court of Appeals for the Fourth Circuit summarized the current sentencing framework:

> In *United States v. Booker,* 543 U.S. 220, 245, 125 S.Ct. 738, 160, L.Ed.2d 621 (2005), the Supreme Court rendered the Sentencing Guidelines "effectively advisory." Nevertheless, district courts in the post-Booker landscape must follow specific steps to arrive at an appropriate sentence.
> First, the district court must correctly calculate a defendant's sentence under the now-advisory guidelines. *See Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."); *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2465,

168 L.Ed.2d 203 (2007). A sentence based on an improperly calculated guideline range will be found unreasonable and vacated. *See Gall*, 128 S.Ct. at 597 (noting that "improperly calculating" the applicable Guidelines range constitutes a "significant procedural error").

Next, the district court must allow "both parties an opportunity to argue for whatever sentence they deem appropriate." *Gall*, 128 S.Ct. at 596. In light of these arguments, the district court must then "consider all of the § 3553(a) factors," *id.*, keeping in mind the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007) (quoting 18 U.S.C. § 3553(a)); *see also Gall*, 128 S.Ct. at 596 & n. 6. In so doing, the court "must make an individualized assessment based on the facts presented" and cannot "presume that the Guidelines range is reasonable." *Gall*, 128 S.Ct. at 596-97. If the sentencing court believes "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 597.

Finally, the district court "must adequately explain the chosen sentence." Id. This "allow[s] for the meaningful appellate review" and "promote[s] the perception of fair sentencing." *Id.* Notably, if the court imposes "an unusually lenient or an unusually harsh sentence," it must provide "sufficient justifications" for its selection. *Id.* at 594; *see also Rita*, 127 S.Ct. at 2468 (stating "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has … a reasoned basis for exercising his own legal decisionmaking authority").

II. <u>Applying 18 U.S.C. § 3553(a)</u>

Considering all of the relevant factors of 18 U.S.C. § 3553(a), a sentence of 108 months incarceration, the low-end of the guidelines, would be "sufficient, but not greater than necessary" to accomplish the numerous goals of sentencing.

A. The first set of factors to be considered to determine an appropriate sentence is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a).

The facts of this case have been detailed in the agreed Statement of Facts and again on pages 4-6 of the PSR.

2

The facts of the case against Charles D. Halderman reveal an ordinary criminal conspiracy to commit robbery. "Ordinary" in the sense that Mr. Halderman is charged in a three count indictment with two others who have pleaded guilty to additional charges and may have held additional goals. "Ordinary" in the sense that Mr. Halderman was "recruited" (Statement of Facts and PRS page 5) to participate in a conspiracy to commit robbery. "Ordinary" in the sense that Mr. Halderman took little, if any, steps in an attempt to advance the charged conspiracy to commit robbery. "Ordinary" in the sense that Mr. Halderman was recruited to participate in a scheme that was developed and planned by others and he simply agreed to participate.

As the PSR reveals, in October 2015, Robert Doyle (Doyle) discussed a plan to rob a jewelry dealer and use the proceeds for an upcoming "race war." This discussion was between Doyle and an informant cooperating with the Government (hereinafter "CS"). Later in October, Doyle and Ronald Cheney (Cheney) met with the supposed jewelry dealer in an attempt to plan the robbery. Doyle and Chaney also met with undercover FBI agents in an attempt to purchase firearms and explosives.

What the PSR does not make clear is that Mr. Halderman was neither present during nor aware of any of these meetings. To be clear, Mr. Halderman had engaged in private conversations with Doyle about a robbery, but there was no suggestion that the robbery would fund a "race war." There was a gap in time between when Mr. Halderman and Doyle initially discussed a robbery and the recorded statements between the CS and Doyle.

While Mr. Halderman was not charged in the purchase or possession of the purchase of firearms from the FBI, it is noteworthy that he was not even aware of the

plan. He was totally in the dark as to Doyle and Cheney's plans to purchase firearms and explosives.

The fact that Doyle and Chaney were planning and attempting to purchase firearms together and Mr. Halderman was not aware is the proper context to view the conspiracy to commit robbery. Paragraph 18, page 6 of the PSR accurately describes Doyle's statements regarding Halderman's planned participation in the robbery. It is clear from Doyle's statements that Halderman was just a tool in their plan of robbery. Doyle describes Mr. Halderman as "young" and a "soldier" and all he (Doyle) has to do is put the tools in Mr. Halderman's hands. He is clearly describing a person who he believes is willing to go along with the crime, but is not a participant in the planning of the crime.

There are two recorded statements between Mr. Halderman and the CS. The first conversation occurs on November 2, 2015, and the second conversation occurs on November 3, 2015. It is important to bear in mind that the recorded conversations of November 2 and 3 occur **after** the October 25, meeting between the jewelry dealer and Doyle (and Cheney, who remained outside of the meeting).

On November 2, the CS has arranged employment for Mr. Halderman and the two of them are painting. After Mr. Halderman inquires if the painting job can "turn into a permanent thing for me," the CS raises the topic of the robbery. The CS asks if Mr. Halderman has been thinking about "the spot?" Mr. Halderman responds with "yeah, you got one in mind?" Then the CS says "Huh?" and Mr. Halderman repeats, "You got one in mind?" It is clear at this point on November 2, 2015, Mr. Halderman is not aware of any meeting that has occurred between Doyle and the jewelry dealer. Later in the

conversation the CS explains that Mr. Halderman has missed the planning and how the plan of a robbery has evolved to a jewelry store. When the CS shows Mr. Halderman a picture of the jewelry store, Mr. Halderman responds with, "That's the jewelry spot?" Soon after this statement, Mr. Halderman says, "He [Doyle] said dude lives up the street from him." Then Mr. Halderman says, "Nah, he was telling me about something, (UN) the one's in the (UN) he said dude lives up the street from me." Again, this is proof that Mr. Halderman was not involved in the planning of the robbery and was being given details by the CS and not the co-conspirators.

In the backdrop of this conversation (and not presented in the PSR) is the fact that Doyle had initially approached Mr. Halderman about conducting a robbery of a person that was selling coins via craigslist. The genesis of the conspiracy to commit robbery began when Dolye told Mr. Halderman that they should rob a person advertising coins for sale on craislist. Dolye pointed out that the merchant had advertised his address and it was located close to Doyle and/or Halderman. This initial plan was of a person advertising coins for sale on craigslist and there was no discussion of the profits of this crime funding a race war. By the time that the CS speaks about the robbery with Mr. Halderman on November 2 there had been planning and meetings regarding the robbery and Mr. Halderman was completely unaware. It is clear from the above conversation that Mr. Halderman was not aware that the subject and location of the robbery had changed.

Later in this conversation with the CS, Mr. Halderman says that a barrier to his participation in the robbery is his lack of a firearm. He states clearly that he does not possess a firearm. To that end, when Mr. Halderman was arrested at his residence, it was searched and there were no firearms recovered.

Case 3:15-cr-00191-JRS Document 56 Filed 04/11/16 Page 6 of 8 PageID# 197

The same recorded conversation between the CS and Mr. Halderman on November 2, reveals Mr. Halderman's motivation for the robbery. When the CS asks about he robbery, Mr. Halderman responds with, "I need some money."

Throughout this conversation it is clear Mr. Halderman was not part of the detailed planning of the robbery and did not even know the location of the place to be robbed. It is also clear that his motivation to participate in the robbery was for money. There were no conversations about funding a "race war."

In the only other recorded conversation between the CS and Mr. Halderman on November 3, 2015, Mr. Halderman does in fact say that he is "firm" when referring to his participation in the robbery. However, the robbery was certainly not imminent in Mr. Halderman's mind as he said, "yeah, we'll all have to sit down and all get together when everybody's off and we ain't doing shit." And then he followed that with, "let's uh…let's wait to next time we get together to talk about it."

It should also be noted that this telephone conversation was initiated by the CS and the topic of conversation was initiated by the CS. On November 3, when this telephone conversation was initiated by the CS, the Government had already scheduled and planned the control sale of firearms to Doyle and Cheney. So, the CS was clearly calling Mr. Halderman for a specific reason and at a specific time. It was not a mistake or coincidence that the CS called Mr. Halderman on November 3, and told him he needed to know who was "in" for the robbery.

  B. The second set of factors contemplated by 18 U.S.C. § 3553(a) discusses the "need for the sentence imposed." A sentence at the low-end of the guideline range would sufficiently accomplish this goal.

  In the proper context, a sentence of 77 months is appropriate in this case. Mr. Halderman was recruited to participate in a robbery and he agreed because he needed money. There were no significant steps taken by Mr. Halderman toward this robbery. The Government's evidence really shows a series of high level conversations that lacked the detail to actually be accomplished.

  Mr. Halderman's criminal history category properly accounts for his criminal record and is reflected in the sentencing guideline range.

  For all of the above reasons, a sentence at the low-end of the sententencing guideline range is appropriate.

           Respectfully submitted,
           CHARLES HALDERMAN

           By :_____/s/_____
             Counsel

George A. Townsend, IV, Esquire
1 East Cary Street, Suite 202
Richmond, Virginia 23219
Tel. (804) 782-0200
Fax (804) 782-0115
VSB No. 41972
gtownsend.crimlaw@me.com

CERTIFICATE OF SERVICE

      I do hereby certify that on the eleventh day of April 2016, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF filing system which will then send a notification of such filing (NEF) to counsels of record.

Peter Duffey  
Office of United States Attorney  
600 East Main Street, Suite 1800  
Richmond, Virginia 23219  
Phone: 804-819-5400  
Fax: 804-771-2316  
peter.duffey@usdoj.com  

                                             /s/  
                                George A. Townsend, IV, Esquire  
                                1 East Cary Street, Suite 202  
                                Richmond, Virginia 23219  
                                Tel. (804) 782-0200  
                                Fax (804) 782-0115  
                                VSB No. 41972  
                                gtownsend.crimlaw@me.com