**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA )  | |
| ) | |
| v.    ) | Criminal No. 3:15-CR-191-003 |
| ) | |
| CHARLES D. HALDERMAN,   ) | |
| ) | |
| *Defendant*.   ) | |

## UNITED STATES' POSITION ON SENTENCING

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, and Peter S. Duffey and Thomas A. Garnett, Assistant United States Attorneys, hereby submits its position with respect to sentencing. The United States concurs with the guidelines calculation of the U.S. probation officer. Accordingly, the United States agrees that the appropriate total offense level for this defendant is 21, with a criminal history category of VI, yielding a guidelines range of 77-96 months on Count One.

The United States believes that a sentence at the upper end of the defendant's guideline range is appropriate in light of the nature of the conspiracy the defendant willingly joined, and the defendant's lengthy, frequently violent criminal history both outside and inside of prison. Accordingly, the United States respectfully recommends a sentence of 96 months' incarceration.

### I.  BACKGROUND

Sometime in October 2015, HALDERMAN knowingly became part of a plan with others to take jewelry, precious metals, and U.S. currency from a local jewelry distributor by force and threats of violence. The jewelry distributor engaged in interstate commerce. In accordance with

this plan, HALDERMAN agreed to assist at least two co-conspirators in the robbery, which was to take place sometime in November 2015.

As part of the plan, on October 25, 2015, HALDERMAN's co-conspirators met with an individual whom they believed was a jewelry distributor and who was the intended victim for their planned armed robbery. The person who the defendant's co-conspirators met with that day was actually an undercover FBI agent, who had previously been inserted in place of the jewelry dealer. HALDERMAN's co-conspirator placed an order to purchase approximately $100,000 worth of jewelry and precious metals. Another meeting was then planned where, instead of actually purchasing $100,000 worth of precious metals, the conspirators would instead rob the jewelry dealer of the ordered items, as well as any other currency or valuable items the jewelry dealer had in his possession at the time of the robbery. During this time period, HALDERMAN's co-conspirator made specific, detailed threats to kill the jeweler as part of the robbery scheme to a confidential informant, explaining to that confidential informant exactly how the co-conspirator would kill the jeweler and subsequently dispose of the jeweler's corpse. The co-conspirator also explained to the confidential informant that one of the individuals involved in the robbery would be HALDERMAN, who the co-conspirator explained was selected because HALDERMAN will do "whatever." HALDERMAN's co-conspirator went on to explain that HALDERMAN was "just young," and that all that was necessary was to "put the tools in [HALDERMAN's] hands."

HALDERMAN confirmed, in recorded conversations, that he was "firm" in his commitment to his co-conspirators' plans to rob the jeweler, describing himself as "hungry" and a "soldier." HALDERMAN also explained, during these recorded conversations, that while he had "no problem" with participating in the armed robbery scheme, he was concerned that he did not currently possess his own firearm. HALDERMAN's co-conspirators, meanwhile, had also

arranged to purchase firearms from individuals the co-conspirators believed to be black-market gun dealers, and on November 8, 2015, one of the defendant's co-conspirators purchased weapons, silencers, and explosives from an undercover FBI agent.

That same afternoon, the FBI arrested HALDERMAN and his co-conspirators before they could commit the planned armed robbery.

## II. POSITION ON SENTENCING

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing guidelines are "effectively advisory." *Id.* at 245. Nonetheless, the advisory nature of the Guidelines "does not mean that they are irrelevant to the imposition of a sentence." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006); *see also United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the range prescribed by the sentencing guidelines after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.*

Based on the Section 3553(a) factors, the United States recommends the Court impose a sentence of 96 months' incarceration.

### A. Nature and Circumstances of the Offense; Provide Adequate Punishment

Here, HALDERMAN willingly agreed to become part of a conspiracy to commit armed robbery of a local businessman, during which his co-conspirator made credible threats to kill the intended victim as an integral part of the robbery scheme. The Court is familiar with the factual circumstances of the planned robbery – that the presumed precious metal dealer had already met with the defendant's co-conspirator, and at that meeting, agreed to meet again to supply the co-conspirator with $100,000 worth of diamonds and precious metals. The precious metal dealer had seen the co-conspirator's face; knew his voice; had his phone number. Had the conspirators' planned armed robbery been allowed to continue, the likelihood that the conspirators would have allowed the precious metal dealer to live – able to identify the co-conspirator – is exceedingly slim. Similarly, the weapons acquired by HALDERMAN's co-conspirators add credence to the conspiracy's expressed outlines: both of the firearms purchased by HALDERMAN's co-conspirators on November 8 came equipped (per the co-conspirator's order) with silencers.

HALDERMAN's willingness to lend his services to this lethal conspiracy is not in doubt; in recorded conversations, the only concern that HALDERMAN expressed was that *he* did not have a firearm to bring along to the robbery. HALDERMAN's co-conspirator deliberately picked HALDERMAN for the operation, explaining to another individual that HALDERMAN was willing to do "whatever" – that the only encouragement HALDERMAN needed to participate was "tools in his hands."

The circumstances of this offense – even without further consideration of HALDERMAN's particular history and characteristics – demonstrates his blatant disregard for the law, as well as the safety of individuals in the community at large, and supports the government's request for a sentence at the top end of the defendant's guideline range.

### B. History and Characteristics of the Defendant

The defendant's criminal history is lengthy, and violent – and even more concerning, entirely consistent with his subsequent unlawful behavior while incarcerated and on probation.

#### 1. Criminal History

The defendant's criminal history begins in 1997, when the defendant was 13 years old. Before the defendant reached age 18, he had accumulated some eight separate juvenile criminal adjudications – the last of which, when the defendant was 17, involved the defendant being adjudged guilty of Brandishing a Firearm and Malicious Wounding for his role in a fight that he admitted involved one of his companions using brass knuckles to beat the victim. PSR ¶¶ 45-52.

The defendant's criminal conduct continued unabated upon his release from the Department of Juvenile Justice, beginning with his first adult felony conviction, at age 19, for stealing an automobile. PSR ¶ 54. Over the next 11 years – despite being incarcerated between 2005 and 2011, and again between 2012 and 2014 – the defendant compiled 10 more criminal convictions. PSR ¶¶ 54-60. Four of those convictions were felonies, including the defendant's second violent offense, an Unlawful Wounding conviction in 2005. *Id.*

During the defendant's time in prison (discussed further below), the defendant became affiliated with the Aryan Brotherhood, a white supremacist gang; he does not dispute the PSR's conclusion that he remains affiliated with that organization.

#### 2. Conduct While Incarcerated and Under Supervision

The defendant's time in the state penal system has been entirely consistent with his behavior outside of it – which is to say, determinedly unlawful. During the time the defendant spent incarcerated between 2005 and 2011, he committed the following offenses:

- Stealing

5

- Possession of Unauthorized or Unprescribed Medication (twice)

- Tattooing or Branding of Self or Others (twice)

- Possession of Contraband

- Fighting

- Failure to Follow Rules (six offenses)

- Disobeying an Order (three offenses)

- Under the Influence of Drugs

- Refusing to Work

- Failure to Follow Count Procedures

- Lying or Giving False Information to Employee

- Being in an Unauthorized Area (three offenses).

The defendant was released from the Department of Corrections on March 2, 2011. Within 15 days, he had already been arrested for his first offense, Driving While Intoxicated. PSR ¶¶ 57-58. Some nine days following this arrest, he was arrested again, this time for Petit Larceny. PSR ¶ 59. The defendant was subsequently found in violation of his suspended sentences in September 2011, and returned to prison. PSR ¶ 57. During the defendant's incarceration between 2012 and 2014, the defendant committed the following offenses:

- Possession of Gang Related Materials or Paraphernalia (White Supremacists)

- Fighting

- Vulgar/Insolent Language/Gesture toward Employee.

The defendant has been continuously engaged in criminal conduct since the age of 13. That unlawful conduct has been remarkably consistent, regardless of his status – whether free or incarcerated or under supervision, the defendant is determined to behave unlawfully.

### C. Need to Deter Future Criminal Conduct and Protect the Public from Defendant's Future Criminal Conduct

General deterrence is a legitimate consideration in this case, and a lengthy sentence will send a clear message to other, similarly situated individuals who might be tempted to return to their previous criminal activities (or enter into new illicit endeavors) as a faster, more rewarding way to re-enter society.

The defendant has not been deterred by any of his previous stints of incarceration, and so the Court's concern with providing specific deterrence is likely limited. Following his release in 2011, the defendant managed only two weeks of law-abiding behavior before being arrested; less than a year after his release in 2014, he willingly agreed to join a conspiracy to commit the armed robbery (and likely murder) of a local jeweler. The United States is under no illusion that the defendant is likely to reform in prison – his previous records while incarcerated are sufficient evidence of his disinterest in that prospect – but recommends a sentence at the top end of the defendant's guidelines because the defendant's *ability* to commit further offenses is at least somewhat circumscribed when he is incarcerated.

For precisely the same reasons, however, the Court's concern for the public's safety should be paramount. The defendant has demonstrated that he cannot or will not follow the law. The defendant's instant conviction – conspiracy to commit armed robbery – indicates that he is moving *towards* more violent, dangerous criminal activity. He is an unrepentant recidivist, and the public's safety is best served by a lengthy sentence of incarceration.

## **CONCLUSION**

For the reasons stated above, the United States submits that a sentence at the top end of the advisory guidelines range, **96 months**, is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Dana J. Boente
United States Attorney

By:       /s/
Thomas A. Garnett
Assistant United States Attorney
Virginia Bar Number 86054
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: 804-819-5400
Fax:    804-771-2316
Email: Thomas.A.Garnett@usdoj.gov


Peter S. Duffey
Assistant United States Attorney
Virginia Bar No. 39477
Assistant U. S. Attorney
Office of the U.S. Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5400
(804) 771-2316 (fax)
peter.duffey@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of July, 2016, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF filing system which will then send a notification of such filing (NEF) to counsel of record.

/s/
Thomas A. Garnett
Assistant United States Attorney
Virginia Bar Number 86054
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: 804-819-5400
Fax: 804-771-2316
Email: Thomas.A.Garnett@usdoj.gov